IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OLANDO ORTIZ QUINTERO, | ) | |
| | ) | Case No. 1:18-cv-2597 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **MEMORANDUM ORDER** |
| Defendant. | ) | **AND OPINION** |

## I.    Introduction

Plaintiff, Orlando Ortiz Quintero, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XIV of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 10; ECF Doc. 11.  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards and reach a decision supported by substantial evidence, the Commissioner's final decision denying Quintero's applications for DIB and SSI must be vacated and the case remanded for further proceedings consistent with this memorandum of opinion and order.

## II.     Procedural History

Quintero filed an application for DIB on January 21, 2016, and an application for SSI on April 13, 2016.  (Tr. 58, 267-280).[1]  Quintero alleged that he became disabled on December 26, 2015, due to "back problems."  (Tr. 58, 129, 144, 304).  The Social Security Administration ("SSA") denied Quintero's applications initially.  (Tr. 129-158).  In September 2016, Quintero requested reconsideration and filed a disability report indicating that he had additional treatment for his wrists, back, feet, depression, and sleep issues.  (Tr. 203-04, 315-16).  The SSA denied Quintero's applications upon reconsideration.  (Tr. 161-188).  Quintero requested an administrative hearing.  (Tr. 216-17).  ALJ Eric Westley heard Quintero's case on November 16, 2017, and denied the claims in an April 19, 2018, decision.  (Tr. 52-101).  On September 17, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-9).  On November 12, 2018, Quintero filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Quintero was born on April 1, 1979, and he was 36 years old on the alleged onset date. (Tr. 267, 274).  Quintero finished the sixth grade in Puerto Rico and was not able to communicate in English.  (Tr. 69, 86).  He never received a GED or had any vocational training. (Tr. 86).  Quintero had prior work as a mechanic, but he was not able to perform any of his past relevant work.  (Tr. 68-69).

### B.     Relevant Medical Evidence

On August 8, 2014, Quintero told James Misak, M.D., that he had intermittent, but severe, back pain.  (Tr. 398).  On examination, Dr. Misak noted that Quintero's spine was tender,

---

[1] The administrative transcript is in ECF Doc. 13.

but his gait was normal.  (Tr. 398).  Quintero saw Dr. Misak again on November 10, 2015, and he received a steroid injection for his back pain.  (Tr. 394).

On September 21, 2015, Quintero went to NorthCoast Rehab, LLC, for a spinal examination after he injured his back in a car accident.  (Tr. 340, 566-67).  Records show that he had a normal gait, but he said that walking was painful and he had an antalgic position on the right.  (Tr. 340, 566-67).  On examination, Quintero had decreased posture in his spine, slightly reduced range of motion, and pain on motion.  (Tr. 340, 566-67).  From September 23, 2015, through November 24, 2015, Quintero saw Todd Waldron, D.C., at NorthCoast Rehab, LLC, for 22 sessions of physical therapy.  (Tr. 342-60, 568-86).  At his first 13 sessions, Quintero regularly rated his pain between 5/10 and 7/10.  (Tr. 342-52, 568-78).  Between October 30, 2015, and November 24, 2015, Quintero regularly rated his pain between a 2/10 and 3/10.  (Tr. 353-60, 579-86).  Waldron noted that Quintero showed continuing improvement after each therapy session.  (Tr. 342-60, 568-86).

On October 19, 2015, Quintero told Christopher Gillespie, M.D., that he had ongoing lower back pain, depression, anxiety, and difficulty sleeping.  (Tr. 396).  On examination, Dr. Gillespie noted that Quintero had a symmetric back, no significant tenderness, a normal range of motion, and a negative straight leg raise test.  (Tr. 396).  Dr. Gillespie referred Quintero to behavioral health, prescribed Zoloft for his mental symptoms, and prescribed nabumetone for his pain.  (Tr.  396-97).

On November 11, 2015, Eric McLoney, M.D., took x-rays of Quintero's lower back and found grade 1 anterolisthesis of the L5 vertebra over the S1 vertebra.  (Tr. 405).  Dr. McLoney also found possible bilateral L5 pars defects and no evidence of fracture or vertebral height.  (Tr. 405).  There was also no evidence of scoliosis, and Quintero's disk spaces were well-maintained.  (Tr. 406).

On December 1, 2015, Quintero saw Melisa Kennard, M.P.T., at NorthCoast Rehab, LLC, for a physical therapy evaluation. (Tr. 361, 587). Quintero told Kennard that he had intermittent pain and weakness in his back and legs, sleeping difficulties, and limited tolerance to sitting, driving, bending, lifting, and transferring between sitting and standing. (Tr. 361, 587). He rated his pain as 8/10. (Tr. 361, 587). Kennard noted that Quintero tolerated treatment well and had decreased pain after his therapy session. (Tr. 361, 587). On December 15, 2015, Kennard noted that Quintero walked with an antalgic gait and had "minimal" range of motion. (Tr. 362, 588). On December 29, 2015, Quintero rated his pain as a 6/10 and said that he had difficulty keeping his physical therapy appointments due to his work schedule. (Tr. 363, 589). Kennard noted that Quintero was able to perform increased reps for several exercises, improved his gait normality, and decreased his pain. (Tr. 363, 589). On January 4, 2016, Quintero was able to complete his full exercise program, including biking for five minutes. (Tr. 364, 590). Quintero was again able to complete his full exercise program on January 26, 2016, and Kennard noted that his pain was decreased after therapy. (Tr. 366-67, 592-93).

On February 1, 2016, Quintero told Robert McLain, M.D., that he had pain in his hips and legs. (Tr. 410, 449). On examination, Dr. McLain noted that Quintero had spondylolisthesis in his lower back and a herniated disk. (Tr. 410-11, 449-50). Diagnostic imaging showed compromised L5-S1 height, but all other disk spaces in the lumber spine were normal. (Tr. 498); *see also* (Tr. 408) (x-rays on February 11, 2016. On February 12, 2016, Dr. McLain conducted a spinal fusion surgery on Quintero. (Tr. 412-14, 446-48). Quintero tolerated the procedure well and was discharged in stable condition on February 13, 2016. (Tr. 420, 487).

On January 4, 2016, Quintero told Carrie Stredney, C.N.P., that he had lower back pain, which nabumetone did not help. (Tr. 391). He said that only Percocet helped his pain, but he had run out of pain medications. (Tr. 391). Quintero also said that he had some relief after using

a TENS unit for two hours. (Tr. 391). On examination, Nurse Stredney noted that Quintero's pelvis was symmetric, he had decreased lower back curvature, and he had "moderately decreased" range of motion. (Tr. 392).

On April 19, 2016, Quintero went to the emergency department at MetroHealth Medical Center. (Tr. 382-84). Quintero complained that he had pain in his lower back and walked with a cane, but he denied any weakness in his legs. (Tr. 382-83). Examination records showed that Quintero had a normal gait and normal range of motion in his extremities. (Tr. 384). Records also stated that Quintero was "not forthcoming with [his] recent narc[otics prescription]," and he was encouraged to get pain medication refills from his surgeon. (Tr. 384). Quintero was offered Toradol and Mobic, but he declined and was angry that he did not get Percocet. (Tr. 384).

On April 22, 2016, Quintero told Cary Scott, M.D., that he had continued back pain, and that walking or movement made his pain worse. (Tr. 415, 474, 477). Quintero denied any pain in his extremities or neck. (Tr. 416, 477). On examination, Quintero had decreased range of motion and muscle spasms in his back, positive straight leg raise, full range of motion in his extremities, and a normal gait. (Tr. 417-18, 479-80). On June 24, 2016, Quintero told Dr. Scott that he continued to have lower back pain radiating down his legs and that he ran out of pain medication. (Tr. 466). Quintero again denied any extremity or neck pain, and examination revealed that he full range of motion in his extremities and a normal gait. (Tr. 469-71).

On April 27, 2016, Quintero told Donald Eghobamien, M.D., that he was doing well after his back surgery until his pain sharply increased to 10/10. (Tr. 422, 489). Quintero said that he also had numbness and tingling in his leg and foot. (Tr. 422, 489). On examination, Dr. Eghobamien noted that Quintero had normal tone, sensation, and range of motion in his upper and lower extremities, but he had an antalgic gait. (Tr. 424, 492-93). Dr. Eghobamien noted that Quintero's surgery was healing well and prescribed him pain relievers. (Tr. 425).

On August 22, 2016, Quintero began physical therapy. (Tr. 460, 510). Records showed that Quintero reported 8/10 to 9/10 pain, difficulty sleeping, and increased pain when walking more than 10 to 20 minutes. (Tr. 460, 510). On examination, Quintero had independent ambulation with some modification. (Tr. 462, 511). Quintero did not show up for scheduled physical therapy sessions on August 26, August 29, and September 1, 2016. (Tr. 457-59). On August 29, 2016, Quintero said that he was "busy," and on September 1, 2016, he said that he was ill. (Tr. 457-58). On September 8, 2016, Quintero reported 5/10 pain and said that his home exercise program helped with his symptoms, but he also said he needed to use narcotic pain relievers. (Tr. 455). Records indicated that Quintero had improved strength, range of motion, gait, and functional ability. (Tr. 456). Quintero no-showed (without explanation) for his scheduled physical therapy sessions on September 13, 15, 22, and 26, 2016. (Tr. 451-54). On November 23, 2016, Quintero was discharged from physical therapy for noncompliance. (Tr. 513).

On November 11, 2016, Quintero saw Linda Kimble, C.N.S., for treatment of his depression and anxiety. (Tr. 539-43). Quintero reported that he had crying spells, isolated, was irritable, and had difficulty sleeping. (Tr. 539). On examination, Quintero had normal appearance, build, demeanor, orientation, thought process/content, perception, and cognition. (Tr. 540). Nurse Kimble prescribed Quintero buspirone, Cymbalta, Zoloft, and trazodone. (Tr. 542). On January 12, 2017, Quintero reported that he'd had audio and visual hallucinations, and nurse Kimble adjusted his medications. (Tr. 554-56). At follow-ups on February 23, April 18, and August 18, 2017, Quintero reported that his medications helped, but he continued to have difficulty sleeping, hallucinations, and anxiety. (Tr. 557-65, 607-11).

On January 27, 2017, Quintero told Dr. McLain that he continued to have back pain radiating down his legs. (Tr. 508). Examination revealed that Quintero had 5/5 strength in his

upper and lower extremities, no weakness, full range of motion in all joints and no swelling in his legs. (Tr. 509). Dr. McLain scheduled Quintero for a lumbar disc fusion with cage placement and ICB harvest surgery. (Tr. 508). Dr. McLain and Kimberly Nemeth, D.O., performed the surgery on January 31, 2017. (Tr. 503, 505). Quintero was stable at the end of the procedure. (Tr. 507). At a follow-up on February 1, 2017, Quintero denied any joint swelling, and examination did not reveal any abnormalities or pain in Quintero's neck, shoulders, back, arms, hands, legs, or feet. (Tr. 527, 531). Quintero continued to have full strength and intact sensation. (Tr. 532). On April 26, 2017, Quintero told Dr. McLain that he was "quite impaired," walked with a cane, had pain and weakness in his leg, and continued to have 10/10 back pain. (Tr. 625). Dr. McLain noted that Quintero "never followed up with pain management, so he [did] not have any pain medications." (Tr. 625). Examination showed that Quintero was able to get up and down from the exam table without difficulty, his motor function was intact, and he had satisfactory to excellent alignment in his spine. (Tr. 627). Dr. McLain recommended that Quintero go to physical therapy, use a TENS unit, and follow up with pain management if needed. (Tr. 628).

On May 25, 2017, physical therapy records indicated that Quintero rated his pain between a 7/10 and 10/10. (Tr. 515, 617). Quintero said that his pain was better for a month after surgery, but increased after his medications ran out. (Tr. 515, 617). He also said that using a TENS unit and hot water helped reduce his pain. (Tr. 515, 617). Records also indicated that Quintero could only walk for 5 minutes and could only tolerate 15 to 20 minutes of sitting and standing. (Tr. 515, 617).

On November 1, 2017, Dr. McLain determined that Quintero was "not . . . getting the benefit from fusion that was expected, and he continue[d] to experience daily pain and dysfunction." (Tr. 630). He noted that Quintero walked with a cane, rated his pain as a 10/10,

and said that he was "turned away [from pain management] under the assumption that he was simply seeking pain medications." (Tr. 630). Quintero asked for aquatic and physical therapy, and said that he was unable to finish previously prescribed physical therapy due to insurance issues. (Tr. 630). On examination, Dr. McLain noted that Quintero had no tenderness, was able to stand and walk, and did not have any focal motor weaknesses. (Tr. 632). Diagnostic imaging showed that Quintero's spine was in an optimal position, and there was no evidence of abnormal motion or degeneration. (Tr. 632).

### C. Relevant Opinion Evidence

#### 1. Consultative Examiner

On August 10, 2016, Quintero saw Natalie Meyer, Psy.D., for a consultative examination. (Tr. 435-440). Quintero denied any difficulties understanding tasks at work or getting along with clients. (Tr. 436). He said that he quit working after back surgery and that he had difficulty with mobility and attention after surgery. (Tr. 436). He had anxiety about paying bills and felt depressed and sad after his mother died. (Tr. 437). He said that his wife did the chores at home because he could not stand long enough to do them. (Tr. 437). He required help putting on socks and shoes and walked with a cane. (Tr. 437). Quintero said that he could drive sort distances and cook, so long as he did not need to stand for a long period of time. (Tr. 437). He managed his stress by playing with his daughter, staying quiet, and taking his medication. (Tr. 437). Quintero had clear and logical thought processes, adequate receptive language skills, and no difficulty with word retrieval. (Tr. 438). He was alert, responsive, and oriented. (Tr. 438). He had no difficulty following the conversation or answering questions, but his phraseology, grammar, and vocabulary were in the low average range. (Tr. 438). Quintero had sufficient judgment and insight. (Tr. 438). Dr. Meyer determined that Quintero's anxiety and

depression could lead to decreased attention and concentration, but his mental function was otherwise intact.  (Tr. 439-40).

## 2.    State Agency Consultants

On May 14, 2016, state agency consultant Ermias Seleshi, M.D., evaluated Quintero's physical abilities based on a review of the medical record.  (Tr. 136-39, 141).  Dr. Seleshi determined that Quintero's back pain complaints were consistent with the overall evidence, which showed degenerative disk disease and lumbar back pain that radiated down both legs; however, Quintero's statements about the intensity, persistence, and limiting effects of his symptoms were not supported by the objective medical evidence.  (Tr. 136).  Dr. Seleshi determined that Quintero could lift/carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk up to 6 hours in an 8-hour workday; sit up to 6 hours in an 8-hour workday, and push and/or pull without limitation.  (Tr. 137).  Quintero could never climb ladders ropes or scaffolds.  (Tr. 138).  He could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl. (Tr. 138).  And he could balance without limitation.  (Tr. 138).  He did not have any manipulative, visual, communicative, or environmental limitations.  (Tr. 138).  Dr. Seleshi determined that Quintero was capable of performing a range of light work.  (Tr. 141).  On October 12, 2016, Ann Prosperi, D.O., concurred with Dr. Seleshi's opinion.  (Tr. 167-71, 173).

On August 31, 2017, state agency consultant Katherine Fernandez, Psy.D., evaluated Quintero's mental function based on a review of his medical records.  (Tr. 135, 139-40).  Dr. Fernandez determined that Quintero had affective disorders and substance addiction disorders, but he only had mild restriction of daily living activities and moderate difficulties in maintaining concentration, persistence, and pace.  (Tr. 135).  He did not have any limitations in social functioning.  (Tr. 135).  Dr. Fernandes stated that Quintero was moderately limited in his ability to complete a normal workday and workweek without interruptions from his psychologically

based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. (Tr. 140). But he was not significantly limited in any other domain. (Tr. 140). On October 13, 2016, Melanie Bergsten, Ph.D., concurred with Dr. Fernandez's opinion. (Tr. 166, 171-72).

### D. Relevant Testimonial Evidence

Quintero testified at the ALJ hearing. (Tr. 85-95). An interpreter was present at the hearing. (Tr. 79). Quintero testified that he lived with his wife their five children. (Tr. 86). His wife worked as an elderly care assistant. (Tr. 87). Quintero said that he could stand for five to ten minutes as a time, and his feet felt numb if he sat for too long without moving. (Tr. 91). He said that he walked a "little bit" to move his body and would lay down on his bed or the floor for half an hour to two hours after standing. (Tr. 91). Quintero's inability to stand kept him from cooking or doing other chores. (Tr. 93). Quintero rated his pain as a 9/10, said that it radiated from his spine to his head, and said that he could not lift more than a plate of food. (Tr. 89, 91). He also felt like his shoulders were being pulled down, and his doctors told him that there might be a gap in his vertebral column. (Tr. 95). Quintero said that he last worked as an independent mechanic in 2015, but he closed down his garage because he couldn't stand or sit for five minutes. (Tr. 87-88).

Quintero was not using any pain medications at the time of the ALJ hearing, but was trying to get "something." (Tr. 89). He said that doctors did not want to approve his medications and gave him only muscle relaxants. (Tr. 90). Using a TENS machine and icy hot patch helped relieve his pain momentarily, but his pain returned when he started other activities. He used a cane to walk after his surgery because his knees were weak. (Tr. 89). Quintero said that he tried therapy, but he felt like he got worse. (Tr. 94).

Quintero also testified that he had mental health symptoms, including hearing voices telling him to kill himself. (Tr. 92). He saw a psychiatrist every six weeks and took medication. (Tr. 92). The medication helped him sleep a little, but he would wake up by 2:00 AM with anxiety. (Tr. 92-93). He did not have any side-effects from his mental health medications. (Tr. 93). Quintero said that he believed he would have trouble getting along with people on the job because he never worked in a group environment. (Tr. 93).

Kathleen Rice, a vocational expert ("VE"), also testified at the ALJ hearing. (Tr. 95-100). The VE testified that Quintero had previous work experience as a mechanic, which was medium work. (Tr. 96). The ALJ asked the VE:

> assume a hypothetical individual, that job you just described. I'd like you to further assume this individual is limited to light work that can occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally stoop, kneel, crouch, or crawl. Can tolerate a static work setting and he can perform goal-oriented work but cannot work at a production rate pace. Could this person [perform] Mr. [Quintero's] past work?

(Tr. 97). The VE testified that such an individual could not perform Quintero's past work, but could work as a housekeeping cleaner, merchandise marker, or carwash attendant. (Tr. 97). The ALJ asked the VE whether the individual from the first hypothetical could work if he was additionally restricted to sedentary work. (Tr. 98). The VE said that such an individual could work as an escort vehicle driver, ticket counter, or food and beverage order clerk. (Tr. 98). The VE also testified that no job would be available for an individual who would be off task 20 percent of the workday, or if the individual were absent two times per month on an ongoing basis. (Tr. 99).

Quintero's attorney asked the VE:

> What education level – well let me ask you, and if I were to, if we were to assume that this hypothetical individual is unable to effectively in a workplace, you know, speak in English, would that impact any of your, the sedentary jobs that you mentioned? I believe all of the light jobs you named were language level one. . . . But when I looked at the sedentary jobs, they were all two or three.

(Tr. 100).  The VE said, "Yes. . . . Right.  Because the level one jobs are all production jobs."

(Tr. 100).

## IV.    The ALJ's Decision

The ALJ's April 19, 2018, decision found that Quintero was not disabled and denied his applications for DIB and SSI.  (Tr. 58-71).  The ALJ determined that Quintero had "the following severe impairments: degenerative disc disease and adjustment disorder with anxiety and depressed mood."  (Tr. 61).  The ALJ also determined that Quintero did not have any impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 61-63).  The ALJ determined that Quintero had the residual functional capacity ("RFC") to perform light work, except that:

> he can occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally stoop, kneel, crouch, or crawl, tolerate a static work setting, and can perform goal-oriented work, but cannot work at a production-rate pace.

(Tr. 63).

In assessing Quintero's RFC, the ALJ stated that he "considered all symptoms" in light of the medical and other evidence in the record.  (Tr. 63-64).  The ALJ explicitly considered Quintero's complaints regarding his back, feet, and wrist pain/numbness; depression, anxiety, and hallucinations; sleeping difficulties; inability to stand or sit for longer than five to ten minutes; difficulty walking; cane use; and inability to lift anything without pain.  (Tr. 64).  The ALJ determined that, although Quintero's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence, and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 64).  The ALJ specifically stated that

Quintero's subjective complaints were not consistent with the evidence that "reflects normal examination findings." (Tr. 64). And the ALJ noted that Quintero claims were not consistent with "statements [to providers] suggesting his functioning is not [as] restricted as he alleges it is and his symptoms are not as severe as he alleges they are." (*Id.*). Further, the ALJ found that Quintero's "frequent[] noncomplian[ce] with treatment regimens also undermined his claim, as did his missed therapy sessions, and infrequency of treatment. (Tr. 64, 68). The ALJ also stated that Quintero's subjective complaints were not consistent with generally normal examination findings before and after his 2016 and 2017 surgeries, as well as Quintero's own statements in 2017 that he received relief from his occasional TENS unit use and walked seven times a week for exercise. (Tr. 66, 68). Further the ALJ stated that Quintero's complaints regarding his mental symptoms were inconsistent with evidence indicating that he "repeatedly exhibited normal functioning[;] . . . intact concentration[;] average intelligence[;] . . . normal behavior, demeanor, and conversational ability[; and] . . . normal cognition, thought process, and thought content." (Tr. 66-67).

At Step Five, the ALJ found that Quintero was "not able to communicate in English, and [was] considered in the same way as an individual who is illiterate in English." (Tr. 69). In finding that Quintero was not disabled, the ALJ relied in part on the VE's testimony, as well as the Medical-Vocational Guidelines. (Tr. 69-71). The ALJ first indicated that, if Quintero were able to perform the full range of light work, Medical-Vocational Guidelines § 202.18 would direct a "not disabled" finding. (Tr. 69). The ALJ stated that, because Quintero's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations," he relied on the VE's testimony to determine whether Quintero could work. (Tr. 69-70). Based on the VE's testimony, the ALJ found that Quintero could work as a housekeeping cleaner, merchandise marker, and carwash attendant. (Tr. 69-70).

The ALJ then noted that the hypotheticals to the VE did not include Quintero's age or education (including his illiteracy in English). (Tr. 70). The ALJ stated that "the absence of these factors [was] not fatal to a finding that [Quintero was] not disabled," because: (1) Medical Vocational Guidelines § 202.18 included age and English literacy factors; (2) § 202.18 directed a finding of "not disabled" for an individual who was able to perform all or substantially all of the requirements of light work and had similar age and education to Quintero; and (3) Quintero was able to perform all or substantially all of the requirements of unskilled light work. (Tr. 70). In light of his findings, the ALJ determined that Quintero was not disabled from December 26, 2015, through the date of his decision and denied Quintero's applications for DIB and SSI. (Tr. 71).

## V.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence,

even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial

gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Subjective Symptom Complaints

Quintero argues that the ALJ failed to follow the regulations in evaluating his subjective symptom complaints. ECF Doc. 14 at 9-22. Specifically, Quintero asserts that the ALJ failed to adequately analyze his descriptions of his symptoms' limiting effects on their own terms and based his analysis on "isolated bits of evidence" that did not accurately reflect his overall functioning. ECF Doc. 14 at 10, 16-17. Quintero also contends that the ALJ improperly rejected his subjective complaints based on the infrequency of treatment or treatment noncompliance without first considering why Quintero might have infrequently sought treatment or was noncompliant. ECF Doc. 14 at 9-10, 18-20 (noting that Quintero had limited relief from treatment, physical therapy, and surgery, and he was turned away from pain management). As a result of the ALJ's "selective and cursory analysis," Quintero argues that the ALJ "fail[ed] to adequately articulate legally defensible reasons for finding that [his] description of his symptoms was not credible." ECF Doc. 14 at 15.

The Commissioner responds that the ALJ adequately considered Quintero's complaints regarding the intensity, persistence, and limiting effects of his pain, difficulty standing/sitting/walking, sleep issues, and mental impairments in light of the medical and other evidence. ECF Doc. 16 at 11-13. The Commissioner asserts that the ALJ reasonably determined that Quintero was not as impaired as he alleged, and that the ALJ adequately considered Quintero's reasons for missing physical therapy appointments and failing to take his medications as prescribed. ECF Doc. 16 at 14.

A claimant's "[s]ubjective complaints of pain or other symptoms may support a claim of disability." *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Generally, a claimant must show that: (1) there is evidence underlying medical condition that causes the allege symptoms; and (2) either (a) objective medical evidence confirms the severity of the alleged pain, or (b) the objectively determined medical condition is so severe that it can be reasonably expected to cause the alleged symptoms. *Id.* (citing *McCormick v. Sec'y of Health & Hum. Servs.*, 861 F.2d 998, 10003 (6th Cir. 1988), and *Duncan v. Sec'y of Health & Hum. Servs*, 801 F.2d 847 (6th Cir. 1986)). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003).

If objective medical evidence does not substantiate the alleged intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must look to the other evidence in the record. SSR 12-2p, 2012 SSR LEXIS 1; *see also* SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). Such evidence includes the claimant's "daily activities, medications or other treatments . . . to alleviate symptoms, the nature and frequency of the [claimant's] attempts to obtain medical treatment for symptoms; and statements by other

people about the [claimant's] symptoms."  *Id.*; SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

If an ALJ rejects a claimant's subjective complaints, he must clearly state his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). An ALJ may not find that a claimant's failure to seek treatment comparable to the degree of his complaints, or his failure to comply with treatment, to be inconsistent with the record evidence without first "considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."  SSR 16-3p, 2016 SSR LEXIS 4 (noting that the ALJ may need to ask at an administrative hearing why the claimant has not sought or complied with treatment).

Here, the ALJ complied with the regulations by clearly stating that he rejected Quintero's subjective complaints because: (1) his non-compliance with treatment conflicted with his complaints; and (2) his complaints conflicted with normal examination findings and his own statements to treatment providers.  *Felisky,* 35 F.3d at 1036; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 65).  Reading the ALJ's opinion as a whole and with common sense, the ALJ considered all the record evidence – including Quintero's statements to treatment providers about the relief (and lack of relief) he received from his back surgery as well as his explanations that he was unable to attend two of his several missed therapy sessions because he was "busy" and "ill".  *Buckhannon ex rel. J.H. v. Astrue,* 368 F. App'x 674, 678-79 (6th Cir. 2010); SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 64-67).  Although the ALJ did not discuss Quintero's statement that MetroHealth had turned him away from pain management, that failure is not fatal to the ALJ's analysis.  (Tr. 65-67).  A review of the record shows that Quintero was never turned away from

*pain management* at MetroHealth; rather, he went to the *emergency department* to request opioids, was instead offered non-opioid pain relievers and told to ask his surgeon for refills of his opioid pain relievers, and angrily declined the non-opioid pain relievers. (Tr. 382-84). Although Quintero later misrepresented his *emergency department* visit as a *pain management appointment* in his statements to Dr. McLain, the ALJ was not required to adopt the fallacy as an explanation for Quintero's non-compliance. (Tr. 630). Moreover, even if the court were to conclude that the ALJ did not adequately discuss or consider Quintero's reasons for non-compliance, that error is ultimately harmless because the ALJ gave an adequate and independent alternative reason to reject Quintero's subjective complaints: the inconsistency between Quintero's subjective complaints and the other evidence in the record. *Jones*, 336 F.3d at 475-76; SSR 12-2p, 2012 SSR LEXIS 1; *see also* SSR 16-3p, 2016 SSR LEXIS 4 *15; (Tr. 65). And Quintero has not challenged that alternative reason in his merits brief. *See generally* ECF Doc. 14 at 9-22.

Substantial evidence also supported the ALJ's decision to reject Quintero's subjective complaints. Although Quintero now asserts that he did not comply with treatment recommendations that he receive pain management and physical therapy because treatment did not relieve his symptoms, there is evidence in the record that contradicts such a claim. Such evidence includes: (1) physical therapy notes showing that, when he did attend, he was able to improve his condition; (2) his own statements that home exercise helped; (3) his own requests for Dr. McLain to give him additional referrals to aquatic and physical therapy; and (4) his repeated statements that he was able to manage his pain with medications, when he had them, and had some relief using his TENS unit. (Tr. 342-61, 363, 366-67, 391, 456, 515, 568-87, 589, 592-93, 617, 630). Further, substantial evidence supported the ALJ's finding that Quintero's complaints regarding his pain and ability to sit/stand/walk were inconsistent with other evidence

in the record, including: (1) notes indicating that opioid pain relievers, mental health medications, and physical therapy helped control or improve symptoms; (2) examination findings that he had a normal gait and range of motion; and (3) his own statements that he did not have pain in his extremities. (Tr. 384, 416-18, 456, 469-71, 477, 479-80, 509, 527, 531-32, 557-65, 607-11, 627-28, 632).

Because the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Quintero's subjective symptom complaints, the ALJ's decision to reject Quintero's subjective symptom complaints fell within the Commissioner's "zone of choice." 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545. Accordingly, the ALJ's decision to reject Quintero's subjective symptom complaints must be affirmed.

## C.     Disability Determination

Quintero argues that substantial evidence did not support the ALJ's not-disabled finding at Step Five, because the ALJ failed to incorporate into the hypothetical question to the VE his illiteracy finding. ECF Doc. 14 at 3-8. Quintero asserts that the ALJ's reliance on the VE's testimony that he could perform jobs in the national economy was not harmless error, because all of the jobs that the VE identified "require[d] at least *some* speaking, reading, and writing according to their language development levels described in the DOT." ECF Doc. 14 at 5. Further, Quintero contends that the ALJ also improperly relied on the Medical-Vocational Guidelines in determining that he could work notwithstanding his illiteracy. ECF Doc. 14 at 7. Finally, Quintero argues that the VE's testimony that he could work as a housekeeping cleaner, merchandize marketer, or carwash attendant was inconsistent with the ALJ's finding that he 'cannot work at a production-rate pace." ECF Doc. 14 at 8.

The Commissioner responds that the ALJ's not-disabled finding was supported by substantial evidence. ECF Doc. 16 at 7-10. The Commissioner asserts that a claimant's literacy is not a "functional limitation to be included in the RFC and hypothetical example to the VE." ECF Doc. 16 at 7-8. Instead, the Commissioner asserts that literacy is a vocational factor considered only at Step Five, and it is not part of the RFC analysis at Step Four. ECF Doc. 16 at 7-8. Further, the Commissioner asserts that the ALJ did not improperly rely on the Medical-Vocational Guidelines, but used them as a framework for determining whether Quintero was able to work notwithstanding his illiteracy. ECF Doc. 16 at 9. Finally, the Commissioner argues that the VE's testimony supported the ALJ's finding that he could work as a housekeeping cleaner, merchandize marketer, or carwash attendant notwithstanding his production-rate limitation, because the hypothetical question to the VE included that limitation. ECF Doc. 16 at 10.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a

claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

Education is a vocational characteristic that a VE must consider in evaluating a claimant's ability to adjust to other work in the national economy.  *See Hammond v. Apfel*, No. 99-1451, 2000 U.S. App. LEXIS 6893 *17-19 (6th Cir. 2000) (hypothetical question accurately described a claimant's functioning when the ALJ gave proper instructions to the VE regarding the claimant's educational and reading levels; *see also* 20 C.F.R. § 416.964 (education as a vocational factor).  The ability to communicate in English is relevant to the educational factor.  *Flores v. Berryhill*, No. 1:17-cv-406, 2017 U.S. Dist. LEXIS 214430 *55 (N.D. Ohio Dec. 15, 2017), *adopted by* 2018 U.S. Dist. LEXIS 3065 (N.D. Ohio Jan. 8, 2018); *see also* 20 C.F.R. § 416.964(b)(5) ("Since the ability to speak, read, and understand English is generally learned or increased at school, we may consider [inability to communicate in English] an educational factor.").  As such, an ALJ should ensure that the VE considers a claimant's inability to communicate in English by incorporating it into his hypothetical question to the VE.  *See, e.g.*, *Ortiz-Rosado v. Comm'r of Soc. Sec.*, 12 F. App'x 349, 352 (6th Cir. 2001) (VE's testimony was not ambiguous with regard to the number of jobs available to an individual who was not fluent in English because the ALJ had included the inability to communicate in English in his hypothetical question).  Nevertheless, when the record makes clear that the VE knew the claimant was unable to communicate in English and considered that factor in his testimony, an ALJ's failure to include that characteristic in his hypothetical question is harmless error.  *See Flores*, 2017 U.S. Dist. LEXIS 214430 *57-58 (VE was apprised of claimant's educational level, which included

his English-speaking abilities); *but see Zapata-Alvarez v. Colvin*, No. 14-2830, 2015 U.S. Dist. LEXIS 118361 * (E.D. Penn. Apr. 16, 2015) ("Because the ALJ's hypothetical did not include an English language limitation, the court cannot determine whether the VE's response to the question reflected the [claimant's] inability to read, write, or speak English.").

The ALJ's Step Five "not disabled" finding is not supported by substantial evidence because the ALJ's hypothetical question to the VE did not accurately reflect all of Quintero's vocational characteristics, including his inability to speak English. Here, the ALJ was required to ensure that the VE considered Quintero's inability to speak English because the ALJ had found that Quintero was unable to speak English and was considered as someone who is illiterate in English. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Ortiz-Rosado*, 12 F. App'x at 352; (Tr. 69). Although the court could speculate that the VE considered Quintero's inability to speak English because Quintero used an interpreter at the hearing, such speculation would reach beyond the court's scope of review. *See Rogers*, 486 F.3d at 241 (courts review whether the ALJ's decision was "*supported in the record*" (emphasis added)); (Tr. 79). As it stands, the record does not indicate whether the VE considered Quintero's inability to speak English at all in testifying that a hypothetical individual with the same RFC could work as a housekeeping cleaner, merchandise marker, or carwash attendant. (Tr. 96-100). Although Quintero's attorney later asked the VE what impact the inability to speak English would have on the hypothetical individual's ability to work, the VE's answer – "Yes. . . . Right. Because the level one jobs are all production jobs." – is not clearly responsive to that question. (Tr. 100). This leaves the VE's testimony predicting Quintero's ability to adjust to work no more reliable than consulting a fortune cookie might have been.

Noting that he had failed to ensure that the VE considered Quintero's inability to speak English, the ALJ attempted to obscure his error by reasoning that the Medical-Vocational

Guidelines directed a not-disabled finding because Quintero was *able* to perform all or substantially all of the requirements of light work. (Tr. 70). This conclusion cannot withstand even minimal critique. Immediately before it, the ALJ stated: "However, the claimant's ability to perform all or substantially all of the requirements of this [light] level of work has been impeded by additional limitations." (Tr. 69). And the ALJ used this *inability* as a basis for relying on the opinions of a VE. The Commissioner cannot have it both ways. Quintero cannot be both *able* to perform all or substantially all of the requirements of light work and *unable* to do so at the same time. If Quintero *was* able to perform all or substantially all of the requirements of light work, then there was *no* need for VE testimony, and it was potentially erroneous to relied upon it. Upon remand, the Commissioner will have to choose.

Because the ALJ's hypothetical question to the VE did not accurately reflect Quintero's vocational characteristics, the ALJ's Step Five finding that Quintero was "not disabled" is not supported by substantial evidence.

## VI. Conclusion

Because the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence, the Commissioner's final decision denying Quintero's applications for DIB and SSI must be VACATED and the case REMANDED for further proceedings consistent with this memorandum of opinion and order.

**IT IS SO ORDERED.**

Dated: October 8, 2019

Thomas M. Parker
United States Magistrate Judge